UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Fort Lauderdale Division)

CASE No. 23-61681-CIV-SINGHAL/VALLE

VICKI WATERS, as Personal Representative of the
ESTATE of BRITTNI A. MULDREW, deceased,

     Plaintiff,

v.

ANDREA CALDERON, in her individual capacity,
*et al.*,

     Defendants.

_____/

**DEFENDANTS, ANDREA CALDERON,**
**ALEJANDRO ESCOBAR, AMANDA CUMMINGS, ARTHUR PATTON,**
**AND TY MORGAN'S MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

Defendants, Andrea Calderon ("Officer Calderon"), Alejandro Escobar ("Officer Escobar"), Amanda Cummings ("Officer Cummings"), Arthur Patton ("Officer Patton"), and Ty Morgan ("Officer Morgan") (collectively, "Officers"), pursuant to Rule 12(b)(6), Fed. R. Civ. P., move to dismiss the Third Amended Complaint ("TAC"), [ECF No. 84], filed by Vicki Waters, as the Personal Representative ("Plaintiff") of the Estate of Brittni A. Muldrew ("Estate"), and state in support:

**OVERVIEW**

This action stems from the police-involved shooting of Brittni A. Muldrew ("Muldrew") on August 30, 2021, following a lawful traffic stop. During the stop, Muldrew attempted to murder (or at least cause grievous bodily harm to) the City of Coconut Creek's responding officers by attempting to ram them with her stolen vehicle while trying to flee the scene. As a result, some of the Officers discharged their firearms, resulting in Muldrew's death.

The operative pleading – Plaintiff's now-fourth bite at the apple in this action (and third against the Officers) – asserts state and federal civil rights claims, pursuant to Florida's Wrongful Death Act, Fla. Stat. §§ 768.16, *et seq.*, and 42 U.S.C. § 1983, against the five Officers, individually. Plaintiff's fourth pleading still misses the mark and should be dismissed with prejudice on the grounds of both qualified and sovereign immunity, pursuant to Rule 12(b)(6), Fed. R. Civ. P.

Notably, the TAC, despite not attaching them per the Court's suggestion in its August 5, 2024 Order, [ECF No. 83], continues to rely upon – and completely misrepresent – Officer Calderon's dashcam footage ("DC Footage"), and body-worn camera footage from an unnamed officer ("BWC Footage") as Plaintiff did in the prior pleading. *See* ECF No. 49. Because Plaintiff has previously conventionally filed these videos, [*see* ECF No. 81], the Court can see Plaintiff's gross mischaracterization in her allegations of what actually occurred on the night of Augst 30, 2021.[1] As held by the Eleventh Circuit, when videos referenced in (but not attached to) a complaint contradict the allegations within the complaint, the Court can accept the videos' depiction instead of Plaintiff's blatant misrepresented account. *Jackson v. City of Atlanta, Georgia*, 97 F.4th 1343, 1350 (11th Cir. 2024).

Turning to the claims asserted in the TAC, the state-law wrongful death claims (Counts I through V) should be dismissed because the DC Footage and the BWC Footage, despite Plaintiff's contrary allegations, objectively demonstrate that the Officers did _not_ act in bad faith, with malice, or with wanton or willful conduct. Muldrew was attempting to run over some of the Officers,

---

[1] The DC Footage will be cited as "DC Footage at _:_;" while the BWC Footage will be cited as "BWC Footage at _:_." While only the DC Footage was specifically referenced in the TAC, Plaintiff previously conventionally filed both the DC Footage and the BWC footage as the videos she was relying upon in support of her allegations in the Second Amended Complaint, which are the same factual allegations in the TAC. [ECF No. 81].

including a K-9 officer, and the Officers acted to protect both themselves and their fellow officers from further attempts and to apprehend someone who had just committed a serious crime. They are, therefore, immune from suit, pursuant to § 768.28, Fla. Stat., as to Counts I through V.

Likewise, the Fourth Amendment excessive force claims (Counts VI through X) should be dismissed based upon qualified immunity. Plaintiff cannot establish that her constitutional rights were violated when the Officers defended themselves – and each other – from Plaintiff's use of deadly force with her vehicle. Despite Plaintiff's misrepresentations, the DC Footage shows that the Officers' actions were reasonable, proportional, and lawful, given Plaintiff's extreme actions – namely, attempting to run them over and flee the scene. Finally, as to the failure to intervene claims (Counts XI – XIV), the DC Footage and BWC Footage prove that neither Officer Patton, Cummings, Calderon, nor Escobar had the opportunity to intervene when Officer Morgan attempted to extract Muldrew after the shooting. The altercation occurred within four seconds, and as shown on the videos, none of these Officers needed to intervene with Officer Morgan because his underlying conduct was not unreasonable. Thus, Counts XI-XIV should be dismissed. Accordingly, the Officers respectfully request this Court dismiss the entire TAC, with prejudice.

## THE FACTUAL ALLEGATIONS AND VIDEO FOOTAGE

### I.   THE COURT SHOULD RELY SOLELY UPON THE VIDEOS' DEPICTION OF EVENTS.

Plaintiff's Second Amended Complaint, [ECF No. 49], explicitly referred to and time-stamped allegations in regard to the DC Footage, just like the operative pleading. However, Plaintiff did not attach the DC Footage to her Second Amended Complaint. Thereafter, this Court ordered Plaintiff to conventionally file the video referenced in her Second Amended Complaint. ECF No. 80.  While Plaintiff did conventionally file, the DC Footage as well as the BWC Footage

[ECF No. 81], she did not do so until after the motions to dismiss the Second Amended Complaint had been fully briefed.

Now, within her TAC, Plaintiff relies upon the same videos that she did in her Second Amended Complaint. *See generally* TAC; ECF No. 49. And just like the Plaintiff previously failed to do in the Second Amended Complaint, she fails to attach the videos.[2]  As a result, the Officers incorporate and rely on the conventionally filed videos, [ECF No. 81], as the basis for this Motion. Moreover, to the extent that the TAC does not explicitly refer to the BWC Footage, this Court can properly consider the BWC Footage as part of its review of the operative complaint because the allegations in Paragraphs 52-57 of the TAC can only be seen by viewing the BWC Footage, of which this Court is in possession. *See Baker v. City of Madison*, 67 F.4th 1268, 1277–78 (11th Cir. 2023) (concluding that "the district court properly considered [a defendant officer's] body camera footage . . . when ruling on the motions to dismiss").

Accordingly, while this Court "must construe all ambiguities in the video footage in favor of the plaintiff," if the "video is clear and obviously contradicts the plaintiff's alleged facts, [the Court is to] accept the video's depiction instead of the complaint's account, and . . . view the facts in the light depicted by the video.'" *Jackson*, 97 F.4th at 1350 (citing *Baker,* 67 F.4th at 1277–78); *see also Lewis v. City of Marietta*, No. 23-10614, 2023 WL 8234291, at *2 (11th Cir. Nov. 28, 2023) (stating that at the motion to dismiss stage, the video footage that "obviously contradicts the non-movant's version of the facts will be considered rather than the non-movant's account"). Therefore, this Court need not rely on Plaintiff's allegations and can simply rely on the video

---

[2]  The reason for Plaintiff's repeated refusal to attach the videos is apparent – she wishes to tell a fictional story of what actually occurred on August 30, 2021 in order to survive a motion to dismiss.  However, the Court is not bound by Plaintiff's (mis)representation of those events as it certainly can (and should) rely upon the actual videos referenced in the TAC instead of Plaintiff's portrayal.  *Jackson*, 97 F. 4th at 1350.

footage because the DC and BWC Footage are clearly contradict Plaintiff's alleged facts asserted in her TAC. *Baker*, 67 F.4th at 1278.

## II.     WHAT THE VIDEOS DEPICT

The DC Footage begins with Officer Calderon driving and pulling over a white vehicle, driven by Muldrew. *See* DC Footage at 0:00-1:29. As Officer Calderon approaches the vehicle, Muldrew attempts to exit, but Officer Calderon tells her to stay inside the vehicle. *Id.* at 1:30-1:45. Officer Calderon explains that the reason she pulled Muldrew over was because Muldrew was driving "73 [mph] in a 45." *Id.* at 1:45-1:51. Muldrew claims the vehicle is registered to a friend, and that the person in the passenger seat is not that friend to whom the vehicle is registered. *Id.* at 2:00-2:07. Apparently inebriated, Muldrew, in slurring her words, tells Officer Calderon that her license is suspended and, again, attempts to get out of the vehicle. DC Footage at 2:15-2:20. Officer Calderon tells Muldrew a second time to stay in the vehicle. *Id.* at 2:20-2:30. Officer Calderon then asks if the passenger has a license, and Muldrew states "I don't know if he has it on him, but I know he has a valid one." *Id.* at 2:40-2:50.

During this time, another officer, Officer Patton, arrives at the scene and approaches the passenger side of the vehicle. *Id.* at 3:19-3:20. While Officer Calderon continues getting Muldrew's information, she tells Officer Patton to call "tango 2" or "502." *Id.* at 3:25-3:30. Officer Calderon tells Officer Patton that she is going to check Muldrew's information on "DAVID" as Muldrew does not have any identification. *Id.* at 3:45-3:50. While Officer Calderon searches the DAVID system, Muldrew remains sitting in the vehicle with the door open as Officer Patton speaks to the passenger. *Id.* at 3:50-5:25. Officer Calderon returns to the vehicle and asks Muldrew to confirm her address. *Id.* at 5:25-5:30. After obtaining her address, Officer Calderon returns to her vehicle to continue searching for Muldrew's information on the DAVID system. DC Footage at

5:47. Again, during this time, Muldrew remains in her vehicle with the door open as Officer Patton remains against the passenger door. *Id.* 5:50-8:15.

After being notified that Muldrew's vehicle was reported stolen, Officer Calderon calls out to Officer Patton, who then tells both Muldrew and the passenger to put their hands on the stolen vehicle's dashboard. TAC, ¶32; DC Footage at 8:15-8:25. Officer Calderon says to dispatch that "we are with *that* vehicle." DC Footage at 8:26-8:27 (emphasis added). Officer Calderon approaches the vehicle and commands "do not move," while both officers draw their firearms given that it has become an active felony situation at that point. *Id.* at 8:29. As a result, Officer Calderon radios for additional vehicles and assistance. *Id.* at 8:38. Both Officer Calderon and Patton repeatedly tell Muldrew and the passenger not to move. *Id.* at 8:40-9:03. After a few minutes, Officer Patton explains that they are just "waiting for additional units then we'll get everybody out." *Id.* at 10:20-10:27. After approximately three minutes with their guns drawn, an additional officer calls out to Officers Calderon and Patton. DC Footage at 11:40-11:58. Both Officers, Calderon and Patton, respond saying "two," seemingly indicating the two individuals in the vehicle. *Id.* Officer Patton explains to Officer Calderon that "when the next unit arrives, we are going to take them out towards your side." *Id.*

Next, Officer Cummings and her K-9 arrive on the scene. *Id.* at 12:04-12:09. While Officer Cummings and her K-9 are standing *<u>directly behind</u>* the stolen vehicle, she directs both Muldrew and the passenger to come out of the vehicle with their hands up. *Id.* at 12:10-12:16.[3] Rather than comply and exit the car as requested, Muldrew puts the car in reverse and accelerates backwards

---

[3]  The Court will note the massive distinction in the video from the allegation in the TAC where Plaintiff states that Officer Cummings was "out of the way" before Muldrew tried to ram her. TAC, ¶42.

towards Officer Cummings and her K-9 (as can be heard by the engine revving) before slamming into Officer Calderon's SUV with such force that it pushes the police vehicle backwards from its parked position. *Id.* at 12:17-12:20.[4]

Three seconds after Officer Cummings and her K-9 nearly missed being killed by the stolen vehicle driven by Muldrew, Officer's Cummings, Escobar, and Patton draw their firearms. DC Footage at 12:20-12:22. At this point, Officers Escobar and Cummings are to the left of the driver side door; however, Officer Patton is directly in front of Muldrew's vehicle and would be hit if the car accelerated forward. *Id.* at 12:20-12:22.

In fear of the safety of the other officers and for their own safety, some (but not all) of the Officers discharged their firearms. *Id.* at 12:21-12:27.[5]  In fact, the vehicle continues to rev its engine and pushes Officer Calderon's vehicle further back, even after one firearm was discharged. *Id.* at 12:21-12:23.  The moments that Officer Cummings stood behind the vehicle, to Muldrew reversing and accelerating the vehicle towards Officer Cummings, and shots being fired spanned a total of twenty seconds.[6] *Id.* at 12:08-12:28.

Once the stolen vehicle stopped moving, the Officers placed themselves on both the driver and passenger side of the vehicle when an officer with a baton opens the driver's side door and tells Officer Calderon "to get her out of vehicle." DC Footage at 12:30-13:10. Officer Calderon attempts to get Muldrew out of the vehicle but she is unable to and calls for "hands" and "help

---

[4]  Plaintiff's allegation that Muldrew's "car slowly roll[ed] backwards" (TAC, ¶43) is in stark contrast to the video.

[5]  Though it cannot be readily discerned from the video, not all of the Officers opened fire.

[6] The speed with which these events unfolded, as reflected in the video, is again in direct contradiction to Plaintiff's allegations, alluding that this was not a split-second incident. *See generally*, TAC.

help help." *Id.* at 13:20-13:33. Officer Morgan then arrives to assist Officer Calderon in apprehending Muldrew and strikes an apparent non-compliant Muldrew with his baton *one time*. DC Footage at 13:33-13:40; BWC Footage at 1:40-1:45. Officer Morgan then pulls Muldrew out of the vehicle and places her on the ground. BWC Footage at 1:45-1:57. Officer Morgan does <u>not</u> strike Muldrew again with his baton; instead, Officer Morgan strikes the ground to close his baton and puts it away in his holster. BWC Footage 1:55-1:59.[7] Further, except for Officer Calderon, none of the other Officers were near Officer Morgan. BWC Footage at 1:40-1:45.

The Officers then prepare to perform first aid on Muldrew and do so once a trauma kit is brought. DC Footage at 13:48-15:00. The Officers continued to perform first aid until they are relieved by paramedics who arrived at the scene. DC Footage at 15:00-19:48. Towards the end of the DC Footage, Officer Calderon states "I never shot my gun." *Id.* at 23:50-23:56. Muldrew is then taken on a stretcher by the paramedics. *Id.* at 24:30-33.

## ARGUMENT

### I.   THE OFFICERS ARE ENTITLED TO SOVEREIGN IMMUNITY, PURSUANT TO FLA. STAT. § 768.28(9)(A), AS TO COUNTS I THROUGH V.

Where a government employee acts "within the scope of employment and does not act in bad faith, with malicious purpose, or a in manner exhibiting wanton and willful disregard, the plaintiff's <u>*exclusive recourse*</u> is to seek damages from the governmental entity[.]" *Keck v. Eminisor*, 104 So. 3d 359, 366 (Fla. 2012) (citing Fla. Stat. § 768.28) (finding government employee was entitled to sovereign immunity) (emphasis added).[8] "[T]he only way that the

---

[7]  Another instance where Plaintiff misrepresents the video is in Paragraph 54 where she alleges that Officer Morgan "repeatedly" struck Muldrew and continued to do so after she had been extracted from the vehicle.  TAC, ¶¶ 52, 54.

[8]  Like qualified immunity, Section 768.28 immunity is not merely immunity from liability, but rather immunity from being forced to participate as a defendant in the litigation. *Keck*, 104 So. 3d at 366-67; *see also Willingham v. City of Orlando*, 929 So. 2d 43, 47-48 (Fla. 5th DCA 2006). "[B]ecause sovereign immunity includes immunity from suit, entitlement to sovereign immunity

individual Defendants can be held personally liable under a state-law [tort] claim is if they acted with bad faith, malice, or in wanton and willful disregard of human rights, safety, or property." *Hayden v. Broward Cnty.,* No. 12-62278-CIV, 2013 WL 4786486, at *13 (S.D. Fla. Sept. 6, 2013); *Guerra v. Palm Beach Cnty. Sheriff's Office*, 657 Fed. App'x 886, 892 (11th Cir. 2016) (affirming dismissal of false arrest claims against two individual police officers based qualified and sovereign immunity where they allegedly "fabricated evidence and concealed exculpatory evidence," as there were no allegations that the officers employed fraudulent or corrupt means).

### A. *None of The Officers Were Acting Outside the Scope of Their Employment.*

Plaintiff alleges that each individual Officer was acting "outside the scope of [their] employment with the City of Coconut Creek" at all pertinent times alleged.  TAC, ¶¶ 62, 69, 76, 83, 90.  However, based on the factual allegations in the TAC and the DC Footage, Plaintiff's wordsmithing is simply a turn-of-phrase designed to avoid the Officers' sovereign immunity, pursuant to Fla. Stat. § 768.28(9)(a).

"Conduct of an employee is within the course and scope of employment when it (1) is of the kind the employee is hired to perform, (2) occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) is activated at least in part by a purpose to serve the master." *Taylor v. Wagner*, No. 8:20-CV-687-CEH-SPF, 2021 WL 2917765, at *4 (M.D. Fla. July 12, 2021) (discussing Florida's sovereign immunity statute in false arrest claim against law enforcement) (quoting *Goss v. Hum. Servs. Assocs., Inc.*, 79 So. 3d 127, 132 (Fla. 1st DCA 2012)). For purposes of Florida's worker's compensation statute, for example, a law

---

should be established as early in the litigation as possible." *Fla. Hwy. Patrol v. Jackson*, 288 So. 3d 1179, 1185-86 (Fla. 2020).

enforcement officer is acting within the course and scope of his employment when engaged in the "prevention or detection of crime or the enforcement of the penal, criminal, traffic, or highway laws of the State." Fla. Stat. § 440.091(1)(a).

The factual allegations in the TAC (and as depicted by the DC Footage) clearly reflect that the Officers acted within the course and scope of their employment as City law enforcement officers at all material times alleged. TAC, ¶¶ 1-60; *see generally* DC Footage. Specifically, the underlying events began when Officer Calderon, while in her police vehicle with lights and sirens, conducted a traffic stop of Muldrew. TAC, ¶¶ 14-18; DC Footage at 0:00-1:29. Officer Calderon explains to Muldrew that the reason she pulled Muldrew over was because Muldrew was going "73 in a 45." DC Footage at 1:45-1:51. Officer Calderon runs a DAVID search, and Officers Patton, Cummings, and Escobar arrive on the scene – in their marked, police uniforms. TAC, ¶¶ 27, 43; DC Footage at 3:10-3:50. At some point during the seizure, Officer Morgan – again, in his marked police uniform, also arrives. TAC, ¶ 52.

The Officers are unquestionably cloaked with the legal authority to conduct traffic stops for speeding, to investigate crimes (such as Muldrew's possession of a stolen vehicle), and to apprehend suspects using force, including deadly force, where necessary. *See, e.g.*, Fla. Stat. § 440.091(1)(a).[9] Simply put, while Plaintiff clearly disputes the underlying legality of the Officers' actions during the traffic stop, there are *no* factual allegations (or any video support from the DC Footage) supporting Plaintiff's claim that the Officers acted *outside* the course and scope of their

---

[9] The Officers' actions at issue here are markedly different and wholly distinguishable from cases in which courts have found that a police officer was *not* acting within the course and scope of their law enforcement employment. *See, e.g.*, *Casey v. City of Miami Beach*, 789 F. Supp. 2d 1318, 1320–21 (S.D. Fla. 2011) (holding a police officer's sexual battery was not within the course and scope of his employment with the City of Miami Police Department).

employment as City police officers during all material times.  Accordingly, the Officers are entitled to sovereign immunity, pursuant to Fla. Stat. § 768.28(9)(a), Fla. Stat.

**B. *Counts I through V (and the Incorporated Factual Allegations) Fail to Show that the Officers Acted in Bad Faith, with Malice, or with Wanton and Willful Disregard.***

 "Florida courts have held that bad faith, malice, and wanton and willful disregard language found in § 768.28(9) 'connotes conduct much more reprehensible and unacceptable than mere intentional conduct.'" *O'Boyle v. Thrasher,* 638 Fed. App'x 873, 879 (11th Cir. 2016) (citing *Richardson v. City of Pompano Beach,* 511 So. 2d 1121, 1123 (Fla. 4th DCA 1987)) (holding plaintiff's state law claim for assault did not meet standard for "the kind of extraordinary conduct required for bad faith, malice, and wanton and willful disregard").

Plaintiff <u>cannot assert</u> sufficient facts demonstrating that the Officers acted with bad faith, malice, and wanton and will disregard for human rights, safety, or property in Counts I through V or within any of the incorporated allegations therein.  *See* TAC, ¶¶ 1-95. Any facts alleged in the TAC are squarely contradicted by the videos that she relies upon within the pleading. Accordingly, as discussed *supra*, this Court need not adhere to Plaintiff's fictional account and can "view the facts in the light depicted by the video.'" *Jackson,* 97 F.4th at 1350.

1. <u>Officers Calderon, Patton, Cummings, and Escobar clearly acted in good faith and without malice or wanton and willful disregard of human rights and safety.</u>

The events of August 30, 2021, began with Officer Calderon and Officer Patton conducting a proper traffic stop. DC Footage at 0:00-8:20. During the stop, they obtained routine identification of the driver of the vehicle. DC Footage at 3:45-8:15. After learning that the vehicle was stolen, Officer Calderon and Officer Patton waited for additional units to arrive. DC Footage at 8:15-8:25. Once additional units arrived, Officer Cummings commanded Muldrew to get out of the vehicle. DC Footage at 12:04-12:10. Rather than exit the vehicle, Muldrew put the car in reverse and accelerated towards Officer Cummings, who was standing directly behind Muldrew's vehicle with

11

her K-9. *Id.* at 12:10-12:20. Officer Cummings and her K-9 were nearly pinned against Officer Calderon's SUV, but for Officer Cummings split-second actions to get out of the way. *Id.* The car continued to rev its engine while Officer Patton was standing in front of the vehicle. *Id.* Justifiably concerned for the safety of the other Officers and for themselves, some of the Officers discharged their firearms. *Id.*, 12:22-12:27. This entire altercation, from Officer Cummings' arrival to shots being fired, occurred under twenty seconds. DC Footage at 12:08-12:28.

Thus, there are no sufficient allegations, in light of the DC Footage, showing that Officers Cummings, Calderon, Patton, and Escobar acted in a manner that would strip them of their sovereign immunity. *Everton v. Willard*, 426 So.2d 996, 998 (Fla. 2d DCA 1983), *approved,* 468 So. 2d 936 (Fla. 1985) (stating the complaint against the deputy should have been dismissed based on his sovereign immunity in the absence of allegations of the deputy's bad faith, malice, or wanton disregard). Accordingly, Officers Cummings, Calderon, Patton, and Escobar are entitled to sovereign immunity as to the state law wrongful death claims in Counts I through IV.

2. <u>Officer Morgan clearly acted in good faith and without malice or wanton and willful disregard of human rights and safety as to the claim in Count V.</u>

The scene to which Officer Morgan arrived was one in which a suspect just used a vehicle as a deadly weapon against his fellow officers resulting in multiple shots being discharged. DC Footage at 12:10-13:10. Upon his arrival, the DC Footage shows that all the Officers are yelling "get her out" and Officer Calderon is struggling to get an apparent non-compliant suspect (Muldrew) out of the vehicle. DC Footage at 12:30-13:33. An officer arriving to the scene such as Officer Morgan could reasonably believe that Muldrew, who just attempted to kill and/or posed a significant threat to law enforcement officers, was resisting arrest and refusing to get out of the vehicle. With such reasonable subjective belief, he struck Muldrew with his baton a single time to assist in taking her out of the vehicle. DC Footage at 13:33-13:40. He then removed her from the

vehicle and placed her on the ground before striking the ground in order to close his baton. BWC at 1:50-2:01.

Neither the DC Footage nor the BWC Footage show that Officer Morgan acted in a manner that would strip him of sovereign immunity. Therefore, Officer Morgan is entitled to sovereign immunity as to the wrongful death claim based upon state law.

## II. THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY AS TO EXCESSIVE FORCE CLAIMS IN COUNTS VI THROUGH X.[10]

Counts VI through IX are excessive force claims against Officer Calderon, Officer Patton, Officer Cummings, and Officer Escobar, based on Muldrew's shooting. TAC, ¶¶ 96-163.  Count X is an excessive force claim against Officer Morgan stemming from his use of force after Muldrew's shooting. TAC, ¶¶ 164-180. The Officers contend that they are entitled to qualified immunity as to the Fourth Amendment excessive force claims because the Officers' use of force was reasonable under the circumstances shown in the footage.

### A. *The Qualified Immunity Analysis.*

A claim of excessive force is analyzed through the lens of the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989).  Whether an officer's use of force was reasonable is based on "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). Reasonableness of force is judged from the perspective of a reasonable officer on the scene, not with the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The Supreme Court has cautioned that "[t]he calculus of reasonableness must embody allowance for the fact that

---

[10] The Court denied the Officer's prior motion to dismiss on these grounds; however, the Court specifically recognized that the motion to dismiss the second amended complaint was fully briefed prior to the filing of the videos. ECF No. 83. Thus, the Officers respectfully seek to dismiss these claims once again based upon the video footage of the incident, as opposed to the contradictory allegations.

police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

"Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, use of deadly force does not violate the Constitution." *Penley v. Eslinger*, 605 F.3d 843 (11th Cir. 2010) (cleaned up); *see also Cantu v. City of Dothan, Ala.*, 974 F.3d 1217, 1230 (11th Cir. 2020) (stating the use of deadly force is permitted if the officer "had probable cause to believe at the time she shot him that he posed a threat of serious physical harm or death to the one or more of the officers"); *Hunter v. Leeds, City of*, 941 F.3d 1265, 1279 (11th Cir. 2019) ("It is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself.").

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Because it is "an immunity from suit rather than a mere defense to liability," its applicability is a threshold question that courts must decide at the earliest possible stage of litigation. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasis added). Qualified immunity may therefore be properly considered on a motion to dismiss. *See, e.g.*, *Flores v. Satz*, 137 F.3d 1275, 1278–79 (11th Cir. 1998) (reversing denial of motion to dismiss).

"The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation . . ." and shield from suit "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)). To be entitled to qualified immunity, the defendant public official

must first show that he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred. *Lee*, 284 F.3d at 1194. Once the defendant meets this burden, the burden shifts to plaintiff to establish both (1) that a constitutional right was violated and (2) that the constitutional right was clearly established at the time the official acted. *Id.; Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1273 (11th Cir. 2008). Clearly established law "should not be defined at a 'high level of generality,'" but "must be 'particularized' to the facts of the case." *White v. Pauley*, 137 S. Ct. 548, 551-52 (2017) (quoting *Ashcroft v. al-Kidd*, 63 U.S. 731, 742 (2011)). If the plaintiff cannot establish either element, qualified immunity is appropriate. *See Pearson v. Callahan*, 555 U.S. 223, 226 (2009).

"To establish that the challenged actions were within the scope of [an officer's] discretionary authority, a defendant must show that those actions were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Habert Int'l Inc. v. James*, 1567 F.3d 1271, 1282 (11th Cir. 1998). "In other words, '[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize.'" *Estate of Cummings v. Davenport*, 906 F.3d 932, 941 (11th Cir. 2018) (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004)).

**B. *The Officers All Clearly Acted in Their Discretionary Authority.***

Here, the TAC relies on Officer Calderon's DC Footage to describe the events leading up to the use of deadly force, utilizing the video's apparent timestamps in an attempt to corroborate the Officer's locations vis-à-vis Muldrew prior to the shooting. TAC, ¶¶ 17-53. As police officers for the City of Coconut Creek, the Officers had the authority to seize Muldrew, initially for speeding and subsequently for being the suspect of a stolen vehicle, which are unquestionably job-

related functions of law enforcement. *Holloman*, 370 F.3d at 1265; *Terrell v. Smith,* 668 F.3d 1244, 1254 (11th Cir. 2012) ("[W]e have held repeatedly that a law enforcement officer may stop a vehicle for violating traffic laws. . ."); *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004) (holding that a police officer acted within his discretionary authority in shooting a suicidal suspect who attempted to attack the police officer); *Benton v. Hopkins*, 190 Fed. App'x 856, 859 (11th Cir. 2006) (holding that the officers acted within their discretionary authority at all times, including when using pepper spray and two to three baton-strikes to force a non-compliant suspect to comply with the officers' commands). Therefore, the Officers were acting within their discretionary authority based on the conduct alleged in the TAC and as depicted in the DC Footage.

Accordingly, the burden now then shifts to Plaintiff to establish that both (1) that Muldrew's constitutional rights were violated and (2) that the constitutional right was clearly established at the time the official acted. *Lee*, 284 F.3d at 1194. Plaintiff cannot meet this burden.

### C. *Officers Cummings, Calderon, Patton and Escobar Did Not Violate Clearly Established Law.*

"'For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel . . . the conclusion for every like-situated, reasonable government agent that what the defendant is doing so violates federal law in the circumstances.'" *McMillian v. Johnson*, 88 F.3d 1554, 1562 (11th Cir. 1996) (quoting *Lassiter v. Ala. A & M Univ.*, 28 F.3d 1146, 1150 (11th Cir. 1994)); *see also Harlow*, 457 U.S. at 818 (holding that official was protected by qualified immunity if conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known"). "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Jenkins by Hall v. Talladega*

*City Bd. of Educ.*, 115 F.3d 821, 827 n.4 (11th Cir. 1997) (citing *Hamilton v. Cannon*, 80 F.3d 1525, 1532 n. 7 (11th Cir. 1996)). The Supreme Court has reiterated "the longstanding principle that 'clearly established law" should not be defined 'at a high level of generality.'" *White*, 127 S. Ct. at 552. Rather, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Thus, Plaintiff must point to a case from the U.S. Supreme Court, the Eleventh Circuit Court of Appeals, or the Florida Supreme Court "where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *See id.* at 552; *see also Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993). Plaintiff simply cannot do so. There is no case that stands for the proposition that law enforcement officers, when faced with deadly force by way of a vehicle, cannot use deadly force in response to such a threat.

In fact, just the opposite is true and supports the application of qualified immunity here. The Eleventh Circuit has routinely held that the use of deadly force by law enforcement officers is permissible towards a suspect utilizing an automobile as a deadly weapon against law enforcement officers. *McCullough v. Antolini,* 559 F.3d 1201, 1207 (11th Cir. 2009) ("[W]e have . . . consistently upheld an officer's use of force and granted immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force."). For example, in a case involving "a driver using a vehicle 'in a dangerous and aggressive manner[,]'" was sufficient to provide the officers with ample reason to believe that the driver 'posed a threat of serious physical harm or death to the officers, or other passerby, especially in light of the speed with which the incident unfolded.'" *Terrell,* 668 F.3d at 1254 (awarding qualified immunity to a police officer who used deadly force after the suspect used a vehicle in dangerous and aggressive manner striking the

officer while another officer, and the passenger of the vehicle, were "so close" to the vehicle that any vehicular movement in reverse would struck them) (citing *McCullough,* 559 F.3d at 1208). Additionally, the Eleventh Circuit has held that "[b]ecause the Constitution permits the use of deadly force to prevent a violent suspect from escaping, the Constitution must also permit the use of deadly force against a suspect who poses not merely an escape risk (because he is not yet in police control), but also an imminent threat of danger to a police officer or others." *Clark v. City of Atlanta, Ga.*, 544 Fed. App'x 848, 856 (11th Cir. 2013) (citing *McCormick v. City of Ft. Lauderdale,* 333 F.3d 1234, 1246 (11th Cir. 2003)). "[U]nder the law the threat of danger to be assessed is not just the threat to the officers at the moment, but also to the officers and other persons if the chase went on." *Pace v. Capobianco,* 283 F.3d 1275, 1280 n.12 (11th Cir. 2002). Police are not required to call off the pursuit and hope for the best. *Scott v. Harris,* 550 U.S. 372, 385 (2007).

For example, in *Robinson v. Arrugueta,* an officer was positioned between his vehicle and the suspect's vehicle in a gap of "two to four feet." 415 F.3d 1252, 1254 (11th Cir. 2005). The suspect's vehicle began to move toward the officer at a speed of one to two miles per hour. *Id.* The officer used deadly force against the suspect operating the vehicle. *Id.* The Eleventh Circuit concluded that the officer's use of deadly force was reasonable under the circumstances because he "had to make a split-second decision of whether he could escape before he got crushed." *Id.* at 1256. In fact, even if the facts revealed that the officer could have escaped unharmed, the Eleventh Circuit noted that a reasonable officer could have perceived that the vehicle was being used as a deadly weapon. *Id.*

Here, no violation of clearly established law under the Fourth Amendment occurred. The DC Footage definitively shows that Officer Cummings is positioned behind the vehicle and tells Muldrew to exit the vehicle. DC Footage at 12:16. Rather than comply with the Officer's request

and exit the vehicle, Muldrew puts the car in reverse while Officer Cummings is standing directly behind the vehicle. *Id.* at 12:17. Unlike the vehicle in *Robinson* and in contradiction of Plaintiff's blatant misrepresentation, the car does <u>*not*</u> move slowly backwards or reverse at a speed of one to two miles per hour (which still would be sufficient for qualified immunity); instead, the car accelerates at such a speed that Officer Cummings and her K-9 barely escape. *Id.* at 12:17-12:24. In fact, Muldrew drove with enough force to push back Officer Calderon's large SUV. *Id.*

At this point, as the Eleventh Circuit has held, a reasonable officer could have perceived that the vehicle, that just attempted to pin Officer Cummings along with her K-9 and possibly kill them both, was being used as a deadly weapon. *Robinson*, 415 F.3d at 1254. None of the Officers within the proximity were safe at this point. The vehicle was still revving its engine, continuing to push Officer's Calderon vehicle further back, with three of Officers, Cummings, Escobar, and Patton, standing within striking distance of the vehicle, and Patton directly in front of it. DC Footage at 12:120-12:35. In light of Muldrew's attempt to kill or seriously injure Cummings and her K-9, it was certainly reasonable for the Officers to believe that Muldrew continued to pose a significant threat to the other officers and possibly have killed them. The use of deadly force in this situation, as depicted by the video, was eminently reasonable and Plaintiff cannot point to a single case wherein the Court has held the opposite under similar circumstances. For those reasons, Officers Calderon, Patton, Escobar, and Cummings are entitled to qualified immunity as to the excessive force claims based upon the use of deadly force.[11]

---

[11] Even though the video shows that not all of the Officers discharged their firearms, all of the Officers are entitled to qualified immunity even if they each did.

**D.** ***Officer Morgan Did Not Violate Clearly Established Law.***

Officer Morgan is also entitled to qualified immunity as to Count X, which is based solely on his actions *after* Muldrew's shooting. TAC, ¶¶ 164-180. Plaintiff cannot meet her burden to establish that Officer Morgan violated clearly established law. *Lee*, 284 F.3d at 1194.

As discussed, *supra*, excessive force is judged solely on an objective basis, and reasonableness of force is judged from the perspective of a reasonable officer on the scene, not with the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Here, Officer Morgan was faced with a split-second decision whether force was needed to get a perceived non-compliant Muldrew, who had just attempted to run over multiple officers, to exit the vehicle. Plaintiff cannot point to a single case – as is her burden here – wherein an officer was found to violate a suspect's Fourth Amendment rights when that suspect had just committed attempted murder of an officer, was believed to be resisting arrest and appearing not to comply with orders to surrender and was struck *one-time* to assist in the apprehension. *See Benton v. Hopkins*, 190 Fed. App'x 856, 859-60 (11th Cir. 2006) (affirming the award of qualified immunity because the officer's baton strikes, which followed continued non-compliance from the suspect even after officers had administered pepper spray directly in the suspects eyes prior to the baton strikes, did not constitute excessive force based upon the totality of the circumstances). Therefore, Officer Morgan is likewise entitled to qualified immunity as to Count IX.

**III.   PLAINTIFF HAS NOT SUFFICIENTLY ALLEGED FAILURE TO INTERVENE CLAIMS IN COUNTS XI THROUGH XIV AGAINST OFFICERS CALDERON, PATTON, CUMMINGS, AND ESCOBAR.**

Plaintiff next asserts four Section 1983 failure to intervene claims, based on violations of Muldrew's Fourth Amendment rights, against Officers Calderon (Count XI), Patton (Count XII), Cummings (Count XIII), and Escobar (Count XIV). Specifically, Plaintiff alleges that these four officers should have (and failed to) intervene when Officer Morgan pulled Muldrew from the

stolen vehicle. TAC, ¶¶ 181-272. She claims Officers Calderon, Patton, Cummings, and Escobar had a "reasonable opportunity to intervene and failed to do so[,]" amounting to deliberate indifference and resulting in violations of Muldrew's Fourth Amendment rights.  TAC, ¶¶ 181-272.

"Essential to any failure to intervene claim lies a central assumption: excessive force was applied." *Ford v. Lebowitz*, No. 18-25144-CV, 2020 WL 5351065, at *8 (S.D. Fla. July 13, 2020), *report and recommendation adopted,* No. 18-25144-CV, 2020 WL 5291979 (S.D. Fla. Sept. 4, 2020) (citing *Hadley*, 526 F.3d 1324, 1330-31 (11th Cir. 2008); *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1342 (11th Cir. 2007); *Reid v. Neal*, 688 Fed. App'x 613, 617 (11th Cir. 2017); *King v. Reap*, 269 Fed. App'x 857, 860 (11th Cir. 2008)). "Put simply, if an officer doesn't observe a use of excessive force, then there can be no duty to intervene and stop it." *Timberson v. Butts Cnty. Georgia*, No. 5:21-CV-00291-TES, 2022 WL 17672624, at *5 (M.D. Ga. Dec. 14, 2022) (citations omitted)*.* To be sure, if the law does not clearly establish that the acting officer used excessive force, then "the other officers had no duty to intervene." *Callwood v. Jones*, 727 Fed. App'x 552, 560 (11th Cir. 2018). Put another way, because there was "no excessive force, there can be no constitutional violation for failure to intervene." *Poole v. Bell*, No. 5:09-cv-233 (MTT), 2012 WL 1074291, at *12 (M.D. Ga. Mar. 29, 2012).

First, for the same reasons that merit the dismissal of the excessive force claim against Officer Morgan (i.e., qualified immunity), Counts XI through XIV should likewise be dismissed because Officer Morgan's use of force did not violate clearly established law. *See supra* Argument Section II.D*.* Thus, the other Officers cannot be expected to intervene where the force at issue was not clearly excessive. *Id.*

Second, even assuming, arguendo, that the underlying use of force could be construed as unlawful (which it was not), the DC Footage reflects that none of four other Officers had the opportunity to intervene or were even in a position to do so. "Even if an officer personally did not use excessive force, an officer who is present at the scene can be alternatively liable for failing to take 'reasonable steps to protect the victim of another officer's use of excessive force.'" *Johnson v. White*, 725 Fed. App'x 868, 878 (11th Cir. 2018) (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2019)). "However, an observing officer must have both the opportunity to intervene and be in a position to intervene and yet fail to do so." *Id.* (citing *Hadley*, 526 F.3d at 1331). "Instances of force that occur within seconds do not place officers in a realistic position to intervene." *Id.*; *see also Hadley*, 526 F.3d at 1331 (finding no evidence from which a reasonable jury could find that an officer could have anticipated and stopped another officer from punching the plaintiff once in the stomach).

Despite Plaintiff's reliance upon video footage, Plaintiff omits the Officers' respective positions following Muldrew's shooting in the TAC. The failure to intervene claims, much like the other causes of action against the Officers, use terms of art – such as "reasonable opportunity to intervene" (TAC, ¶¶ 184, 207, 230, 253) – without any supporting factual allegations. For example, Plaintiff alleges that Officers Cummings, Patton, Calderon, and Escobar each had the opportunity and proximity to stop Officer Morgan (even though intervention was not needed). TAC, ¶¶ 184, 207, 230, 253. However, this allegation is completely refuted by the objective video footage. The BWC Footage shows that Officer Morgan drew his baton, [BWC Footage at 1:41], and struck Muldrew one time. BWC Footage at 1:45. This entire occurrence took four seconds. BWC Footage at 1:41-1:45. The only officer near Officer Morgan is Officer Calderon, who not only has her back to Officer Morgan but also is holding on to Muldrew attempting to remove her

from the vehicle. DC Footage at 13:24-13:30. Officer Patton was separated from Officer Morgan by the car door and was facing the driver of the vehicle. BWC Footage at 1:40-1:45. Officer Cummings, who had just barely escaped from being run over with her K-9 as well as Officer Escobar are nowhere to be seen within either footage during this timeframe. DC Footage at13:30-13:44.

Put simply, the video footage upon which the TAC bases its factual allegations directly contradicts Plaintiff's narrative that Officer Cummings, Patton, Calderon, or Escobar a "reasonable opportunity" to intervene with Officer Morgan – *or even needed to intervene (which they did not)* – and failed to do so. Accordingly, Counts XI through XIV should be dismissed for failure to state a claim as well as the fact that the Officers are entitled to qualified immunity as to these claims.

WHEREFORE, Defendants, Andrea Calderon, Alejandro Escobar, Amanda Cummings, Arthur Patton, and Ty Morgan respectfully request that the Court grant their Motion, dismiss the claims against them individually in the Third Amended Complaint with prejudice, and award any further relief the Court deems just and proper.

DATED:          September 11, 2024          Respectfully submitted,

                                         WEISS SEROTA HELFMAN
                                         COLE & BIERMAN, P.L.
                                         *Counsel for Defendants, Andrea Calderon,*
                                         *Alejandro Escobar, Amanda Cummings, Arthur*
                                         *Patton, and Ty Morgan*
                                         200 East Broward Boulevard, Suite 1900
                                         Fort Lauderdale, FL  33301
                                         Telephone: 954-763-4242

                         By:     /s/ *Bryan C. Siddique*
                                         MATTHEW H. MANDEL
                                         Florida Bar No. 147303
                                         Primary e-mail: mmandel@wsh-law.com
                                         Secondary e-mail:  lbrewley@wsh-law.com
                                         ANNE R. FLANIGAN
                                         Florida Bar No.  113889

Primary e-mail:  aflanigan@wsh-law.com
Secondary e-mail: pgrotto@wsh-law.com
BRYAN C. SIDDIQUE
Florida Bar No. 1018191
Primary e-mail: bsiddique@wsh-law.com
Secondary e-mail: mboschini@wsh-law.com